1

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com
Email: byrd@whafh.com
Email: tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TACARRA JACKSON, Derivatively on Behalf of UNICYCIVE THERAPEUTICS, INC., | Case No: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| SHALABH GUPTA, SANDEEP LAUMAS, GAURAV AGGARWAL, SARA KENKARE-MITRA and JOHN TOWNSEND, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and, | |
| UNICYCIVE THERAPEUTICS, INC., | |
| Nominal Defendant. | |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Tacarra Jackson ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Unicycive Therapeutics, Inc., ("Unicycive" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.      Further, this Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contact with this District to render the exercise of

jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

6.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

7.      Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of the state of Michigan.

### Nominal Defendant

8.      ***Nominal Defendant Unicycive*** is a Delaware corporation with principal executive offices located at 4300 El Camino Real, Suite 210, Los Alto, California 94022. The Company's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "UNCY."  Nominal Defendant is a citizen of the States of Delaware and California.

### Director Defendants

9.      ***Defendant Shalabh Gupta*** ("Gupta") has served as Unicycive's Chief Executive

Officer ("CEO") at all relevant times. Defendant Gupta is also the Company's founder and Chairman of its Board of Directors ("Board"). Upon information and belief, Defendant Gupta is a citizen of the state of California.

10. **Defendant Sandeep Laumas** ("Laumas") has served as a director of the Company at all relevant times. Defendant Laumas also serves as chair of the Audit Committee and as a member of the Compensation Committee and Nominating and Corporate Governance Committee. Upon information and belief, Defendant Laumas is a citizen of the state of Connecticut.

11. **Defendant Gaurav Aggarwal** ("Aggarwal") has served as a director of the Company at all relevant times. Defendant Aggarwal also serves as chair of the Compensation Committee and as a member of the Audit Committee and Nominating and Corporate Governance Committee.

12. Upon information and belief, Defendant Aggarwal is a citizen of the state of California.

13. **Defendant Sara Kenkare-Mitra** ("Kenkare-Mitra") has served as director of the Company at all relevant times. Defendant Kenkare-Mitra also serves as chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Compensation Committee. Upon information and belief, Defendant Kenkare-Mitra is a citizen of the state of California.

14. The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

15. **Defendant John Townsend** ("Townsend") has served as Unicycive's Chief Financial Officer at all relevant times. Upon information and belief, Defendant Townsend is a citizen of the state of California.

16. Defendant Townsend together with Defendant Gupta are collectively referred to herein as the "Officer Defendants."

17. The Director Defendants and Officer Defendants are collectively referred to herein

as the "Individual Defendants."

## BACKGROUND

18.    Unicycive is a clinical-stage biotechnology company that identifies, develops, and commercializes therapies to address unmet medical needs in the U.S.  The Company is developing, among other therapies, oxylanthanum carbonate ("OLC"), a purported next-generation phosphate binder for the treatment of hyperphosphatemia in chronic kidney disease ("CKD") patients on dialysis.

19.    At all relevant times, Defendants consistently touted the prospects of an NDA for OLC for the treatment of hyperphosphatemia in CKD patients on dialysis, assuring investors and analysts of the Company's readiness and ability to satisfy the FDA's, *inter alia*, manufacturing compliance requirements.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

20.    On March 28, 2024, during aftermarket hours, Unicycive issued a press release announcing its full year ("FY") 2023 financial results and business updates. The press release quoted Defendant Gupta as stating:

> The completion of enrollment in our pivotal OLC clinical trial was a critical achievement as we believe the novel characteristics of [OLC] will show its potential as a best-in-class product to treat hyperphosphatemia for patients with [CKD] on dialysis. Positive results from the trial will provide the basis to file a[n NDA] with the [FDA], and we remain on track with topline data expected from the trial towards the latter part of the second quarter of this year and plan to file the NDA shortly thereafter.

21.    The same day, also during after-market hours, Unicycive filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its FY ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was reviewed and signed by each of the Individual Defendants.

22.    The 2023 10-K provided generic, boilerplate representations regarding risks related to "noncompliance with regulatory standards and requirements," including cGMP-related requirements, while stating that the Company has "manufacturing standards . . . established" and

"[e]xecutive management . . . [with] considerable product launch experience" and "expertise in the biopharmaceutical industry," thereby downplaying these risks.

23.     The 2023 10-K also stated that "[w]e plan to continue to use third-party service providers, including contract manufacturing organizations, . . . to manufacture and supply the materials to be used during the development and commercialization of our product candidates[,]" thereby indicating the sufficiency of those third-party service providers for manufacturing purposes.

24.     Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Officer Defendants certified, in relevant part, that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

25.     On April 26, 2024, the Company issued its 2024 Proxy Statement on Schedule 14A with the SEC. The 2024 Proxy Statement solicited shareholder approval for, among other things, the re-election of the Director Defendants to the Board. The 2024 Proxy Statement stated the following regarding the Board:

**Board's Role in Risk Oversight**

Our Board of Directors believes that open communication between management and the Board of Directors is essential for effective risk management and oversight. Our Board of Directors meets with our Chief Executive Officer and other members of the senior management team at quarterly Board of Director meetings, where, among other topics, they discuss strategy and risks in the context of reports from the management team and evaluate the risks inherent in significant transactions. While our Board of Directors is ultimately responsible for risk oversight, our Board committees assist the Board of Directors in fulfilling its oversight responsibilities in certain areas of risk. The Audit Committee assists our Board of Directors in fulfilling its oversight responsibilities with respect to risk management in the areas of major financial risk exposures, internal control over financial reporting, disclosure controls and procedures, legal and regulatory compliance and cybersecurity and data privacy. The Compensation Committee assists our Board of Directors in assessing risks created by the incentives inherent in our compensation policies. The Nominating and Governance Committee assists our Board of Directors in fulfilling its oversight responsibilities with respect to the management of corporate, legal and regulatory risk.

26.     Despite this assurance, the Board was not in fact fulfilling its oversight

responsibilities as, contrary to the Director Defendants' representations: (i) Unicycive's readiness and ability to satisfy the FDA's manufacturing compliance requirements was overstated; and (ii) the OLC NDA's regulatory prospects were likewise overstated. Thus, it was known, or should have been known, to the Director Defendants in the exercise of prudent business judgment that the Board was not exercising adequate risk oversight. As such, the foregoing statement in the 2024 Proxy Statement was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

27.    Had shareholders been aware of the true facts, then it may have impacted how they voted on the proposals in the 2024 Proxy Statement, including whether to re-elect the Director Defendants to the Board.  Accordingly, the representations and omissions rendering the 2024 Proxy Statement false and misleading were material to investors.

28.    On the basis of the foregoing false and misleading statements in the 2024 Proxy Statement, shareholders voted in favor of, *inter alia*, the reelection of the Director Defendants to the Board, thereby enabling them to continue breaching their fiduciary duties to the Company as alleged herein, which led to the Company suffering harm.

29.    On May 13, 2024, Unicycive filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its first quarter ended March 31, 2024 (the "1Q24 10-Q").  The 1Q24 10-Q contained the same statements as referenced above, indicating the sufficiency of Unicycive's third-party service providers for manufacturing purposes.

30.    Appended as exhibits to the 1Q24 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

31.    On June 25, 2024, Unicycive hosted a conference call with analysts and investors to discuss purported positive results from a clinical trial evaluating OLC, which the Company planned to submit as part of the OLC NDA. During the call, a Brookline Capital Markets analyst asked, "in terms of manufacturing, where do you stand and what are the next steps in terms of buildout of the

commercial team?" In response, Defendant Gupta stated, in relevant part:

> With regard to manufacturing, we are very, very much ready and have tested, validated batches at multi hundreds of kilograms level. So we are ready, we are scaling up our manufacturing process. There is no problem. We are ready to launch mid next year. So from manufacturing part, we have been working on these years to be able to scale up.

32.    On August 14, 2024, Unicycive issued a press release announcing its second quarter 2024 financial results and business updates. The press release quoted Defendant Gupta as stating:

> Achieving successful results from our [OLC] pivotal trial was a significant milestone for the company and brings us one step closer to becoming a commercial organization . . . . [W]e believe that we have completed all the necessary requirements from this pivotal clinical trial to fulfill the FDA's requests. We remain on track to submit our NDA by the end of this month, and we maintain a high degree of confidence in the potential for OLC to be a best-in-class commercial product, if approved.

33.    The same day, Unicycive filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its second quarter ended June 30, 2024 (the "2Q24 10-Q").  The 2Q24 10-Q contained the same statements as referenced above, indicating the sufficiency of Unicycive's third-party service providers for manufacturing purposes.

34.    Appended as exhibits to the 2Q24 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

35.    On September 3, 2024, Unicycive issued a press release announcing that it had submitted the OLC NDA to the FDA. The press release stated that "specifications and practices related to chemistry, manufacturing and controls" supported the OLC NDA package, and quoted Defendant Gupta as stating:

> We believe our data support a differentiated and best-in-class therapy that will maintain phosphate control while reducing the onerous pill burden patients currently have to manage. Over the last several months, our team has worked diligently to reach this milestone, and we are now preparing to launch OLC, if approved.

36.    On November 11, 2024, Unicycive issued a press release touting that "the [FDA] has accepted the [NDA] for [OLC] and has set a Prescription Drug User Fee Act (PDUFA) target action

date of June 28, 2025." This press release, too, stated that "chemistry, manufacturing and controls (CMC) data" supported the OLC NDA package, and quoted Defendant Gupta as stating:

> We are thrilled with the FDA acceptance of our first NDA, a significant milestone towards our efforts to bring this important treatment option to patients with kidney disease if approved . . . . With our NDA now under review, we are preparing to commercialize and launch OLC in the second half of 2025, if approved.

37.    On November 13, 2024, Unicycive issued a press release announcing its third quarter 2024 financial results and business updates. The press release quoted Defendant Gupta as stating:

> We are pleased with the tremendous progress we have made over the last several months highlighted by the acceptance of our [OLC NDA] which may result in the potential approval of our first drug in 2025 . . . . With the NDA acceptance now behind us, we are actively preparing to commercialize OLC with the goal of bringing this innovative new treatment to market in the second half of 2025.

38.    The same day, Unicycive filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its third quarter ended September 30, 2024 (the "3Q24 10-Q"). The 3Q24 10-Q contained the same statements as referenced above, indicating the sufficiency of Unicycive's third-party service providers for manufacturing purposes.

39.    Appended as exhibits to the 3Q24 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

40.    On March 31, 2025, Unicycive issued a press release announcing its FY 2024 financial results and business updates. The press release quoted Defendant Gupta as stating:

> 2025 is positioned to be a transformational year for Unicycive, with the near-term potential for FDA approval and commercial launch of [OLC] . . . . We continue to actively prepare to launch OLC, including . . . preparing our commercial infrastructure to rapidly make OLC available to patients upon approval.

41.    The same day, Unicycive filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K was reviewed and signed by each of the Individual Defendants.

42.    The 2024 10-K continued to provide generic, boilerplate representations regarding risks related to "noncompliance with regulatory standards and requirements," including

cGMP related requirements, while stating that the Company has "manufacturing standards . . . established" and "[e]xecutive management . . . [with] considerable product launch experience" and "expertise in the biopharmaceutical industry," thereby downplaying these risks.

43.    In addition, the 2024 10-K contained the same statements as referenced above, indicating the sufficiency of Unicycive's third-party service providers for manufacturing purposes.

44.    The 2024 10-K also stated that "chemistry, manufacturing and controls (CMC) data" supported the OLC NDA package.

45.    Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

46.    On May 14, 2025, Unicycive issued a press release announcing its first quarter 2025 financial results and business updates. The press release quoted Defendant Gupta as stating, in relevant part:

> We are making incredible strides as we prepare for the potential FDA approval of [OLC] so we can bring this treatment to people with [CKD] on dialysis as efficiently as possible . . . . We remain dedicated to bolstering our commercial infrastructure as we strive to deliver a much-needed solution to patients and healthcare providers.

47.    The same day, Unicycive filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its first quarter ended March 31, 2025 (the "1Q25 10-Q"). The 1Q25 10-Q contained the same statements as referenced above, indicating the sufficiency of Unicycive's third-party service providers for manufacturing purposes.

48.    Appended as exhibits to the 1Q25 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

49.    The statements referenced above were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Unicycive's readiness and ability to satisfy the FDA's manufacturing compliance requirements was

overstated; (ii) the OLC NDA's regulatory prospects were likewise overstated; and (iii) as a result, the Company's and the Individual Defendants' public statements were materially false and misleading at all relevant times.

50.    In addition, the Individual Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Unicycive to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Individual Defendants failed to disclose, *inter alia*, Unicycive's true readiness and ability (or lack thereof) to satisfy the FDA's manufacturing compliance requirements, as well as the OLC NDA's true regulatory prospects. The Individual Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## THE TRUTH EMERGES

51.    On June 10, 2025, during pre-market hours, Unicycive issued a press release "announc[ing] an update on its [NDA] for [OLC] to treat hyperphosphatemia in patients with [CKD] on dialysis." The press release stated, in relevant part:

> The FDA communicated to the Company that it had identified deficiencies in cGMP compliance at a third-party manufacturing vendor (one of its CDMO's third-party subcontractors and not its Drug Substance vendor) following an FDA inspection.

> The FDA indicated that, given the identified deficiencies, any label discussions between the FDA and the Company are precluded. The Company has responded to all FDA information requests and expects a final decision from the FDA by the PDUFA action date of June 28, 2025.

52.    On this news, Unicycive's stock price fell $3.68 per share, or 40.89%, to close at $5.32 per share on June 10, 2025.

53.    Then, on June 30, 2025, during pre-market hours, Unicycive issued a press release announcing that the FDA had issued a CRL for the OLC NDA, which "cited deficiencies previously identified at a third-party manufacturing vendor [purportedly] unrelated to [OLC.]" The press

release stated, in relevant part:

> [T]he [FDA] has issued a CRL for its [NDA] for OLC to treat hyperphosphatemia in patients with [CKD] on dialysis.
>
> * * *
>
> After submitting the NDA, and as a part of the application review and routine information requests, the FDA notified Unicycive that a third-party manufacturing vendor of its main [CDMO] was cited for deficiencies following a cGMP inspection.

54. On this news, Unicycive's stock price fell $2.03 per share, or 29.85%, to close at $4.77 per share on June 30, 2025.

55. As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damage.

## DAMAGES TO THE COMPANY

**Securities Class Action**

56. On August 15, 2025, a securities class action complaint was filed in the United States District Court for the Northern District of California against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 in the case captioned: *Elkhodari v. Unicycive Therapeutics, Inc., et al.*, Case No. 3:25-cv-06923 (N.D. Cal.) ("Securities Class Action").

57. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

58. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their

respective roles as officers and/or directors of the Company.

59.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

60.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

61.     As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars. Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

62.     In addition, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

63.     As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## CORPORATE GOVERNANCE

64.     Board members are held to the highest standards of honesty and integrity and charged

with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

65.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Unicycive, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

66.     At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") which covers "officers and, as applicable, directors" of the Company.

67.     In a section entitled "Honest and Ethical Conduct," the Code of Conduct states:

> It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

68.     In a section entitled "Research and Development; Regulatory Compliance," the Code of Conduct states:

> The research and development of pharmaceutical products is subject to a number of legal and regulatory requirements, including standards related to ethical research procedures and proper scientific conduct. We expect employees to comply with all such requirements.

69.     In a section entitled "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code of Conduct states:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

• no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or misclassifies any transactions as to accounts or accounting periods;

• transactions be supported by appropriate documentation;

• the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

• employees comply with our system of internal controls; and

• no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing periodic and current reports that we file with the Securities and Exchange Commission ("SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

• no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

• all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

• no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee, or one of the other compliance resources described in Section 17.

**<u>Audit Committee Charter</u>**

70.     At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee. The Audit Committee Charter states that the Committee's purpose "shall be (1) to oversee the Company's accounting and financial reporting processes and the audit of the Company's financial statements and (2) to fulfill the other Committee responsibilities as delegated to the Committee by the Board. To further these purposes, in discharging the responsibilities set forth below, the policy of the Committee shall be to maintain and foster an open avenue of communication among the Committee, the Company's financial management and the Company's independent auditors."

71.     In a section entitled "Responsibilities," the Audit Committee Charter states the following:

[] DISCUSSION OF THE AUDIT. To review and discuss with the Company's independent auditors (a) the independent auditors' responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process, (b) the overall audit strategy, (c) the scope and timing of the annual audit and (d) any significant risks identified during the independent auditors' risk assessment procedures.

[] AUDIT RESULTS. To review and discuss with management and the Company's independent auditors, the results of the annual audit, including the independent auditors' assessment of the quality, not just acceptability, of the Company's accounting principles and practices, the independent auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates), any material audit adjustments proposed by the independent auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards, including the standards of the PCAOB, as appropriate.

[] ACCOUNTING REPORT. To review and discuss with the Company's independent auditors (a) all critical accounting policies and practices to be used in the audit; (b) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the independent auditors; and (c) other material written communications between the independent auditors and management.

[] FINANCIAL STATEMENT ISSUES. To review and discuss with management and the Company's independent auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentations, including

critical accounting policies and practices, alternative accounting policies available under GAAP related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

[] INTERNAL CONTROLS. To confer with management and the Company's independent auditors, as appropriate, regarding the scope, adequacy and effectiveness of the Company's internal controls, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls and any special audit steps adopted in light of any material control deficiencies; and to review with management and the independent auditors any fraud, whether or not material, that includes management or other employees with a significant role in such internal controls.

[] AUDITED FINANCIAL STATEMENT REVIEW. Upon completion of the audit, to review and discuss with the Company's independent auditors and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditors on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K before the Form 10-K is filed.

[] REQUIRED AUDIT DISCLOSURE AND AUDIT COMMITTEE REPORT. To recommend to the Board that the audited financial statements be included in the Company's annual report on Form 10-K; and to review the disclosures regarding the Company's independent auditors and other matters related to the Committee's activities to be included in the Company's filings with the Securities and Exchange Commission.

[] QUARTERLY RESULTS AND EARNINGS INFORMATION. To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed.

[] EARNINGS INFORMATION. To review and discuss with management and the Company's independent auditors, as appropriate, (a) earnings press releases, (b) any press releases containing information relating to material financial developments, and (c) any financial information and earnings guidance provided to analysts and ratings agencies, in all cases including the type of information to be disclosed, the type of presentation to be made and the use of any pro forma or adjusted non-GAAP information.

[] RISK ASSESSMENT AND MANAGEMENT. To review and discuss with management and, as appropriate, the Company's independent auditors, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures; and to review and discuss with management insurance programs, including director and officer insurance, product liability insurance and general liability insurance (but excluding

compensation and benefits-related insurance) if, in the judgment of the Committee, such review is necessary or appropriate.

[] LEGAL, REGULATORY AND ETHICAL COMPLIANCE. To monitor and administer, and to review with the Company's independent auditors the results of its review of management's efforts to monitor compliance with, the Company's Code of Business Conduct and Ethics, as amended from time to time; to review the Company's compliance with applicable laws and regulations and to oversee any other policies, procedures and programs designed to promote such compliance.

## **DUTIES OF THE DIRECTOR DEFENDANTS**

72.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

73.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

74.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

75.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

76.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

77.     Each Director Defendant, by virtue of his position as a director and/or officer, owed

to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

78.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

80.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

81.    Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

82.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to

1    institute and vigorously prosecute this action.

2        83.    The Company Board is currently comprised of four (4) members including

3    Defendants Gupta, Laumas, Aggarwal, and Kenkare-Mitra.  Thus, Plaintiff is required to show that

4    a majority of the Director Defendants, *i.e.*, two (2), cannot exercise independent objective judgment

5    about whether to bring this action or whether to vigorously prosecute this action.

6        84.    The Director Defendants (or at the very least a majority of them) cannot exercise

7    independent objective judgment about whether to bring this action or whether to vigorously

8    prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

9    complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the

10   Board to initiate this action because making a demand would be a futile and useless act.

11                        **THE DIRECTOR DEFENDANTS ARE**

12                     **<u>NOT INDEPENDENT OR DISINTERESTED</u>**

13       85.    Each of the Director Defendants face a likelihood of liability in this action because

14   they caused and/or permitted the Company to make false and misleading statements and omissions

15   concerning the information described herein.  Because of their advisory, managerial, and directorial

16   positions within the Company, the Director Defendants had knowledge of material, non-public

17   information regarding the Company and were directly involved in the operations of the Company at

18   the highest levels.

19       86.    The Director Defendants either knew or should have known of the false and

20   misleading statements that were issued on the Company's behalf and took no steps in a good faith

21   effort to prevent or remedy that situation.

22       87.    Each of the Director Defendants, by virtue of their roles, were required to, among

23   other things: (i) ensure that the Company complied with its legal and regulatory obligations and

24   requirements; (ii) properly and accurately guide investors and analysts as to the true financial

25   condition of the Company at any given time; (iii) remain informed as to how the Company

26   conducted its operations, make reasonable inquiries, and take steps to correct any improper

27

28

conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

88.   As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

89.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

90.   Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

91.   The Director Defendants also each reviewed, approved, and otherwise solicited the 2024 Proxy Statement which contained the false and misleading half-truths in violation of 17 C.F.R. § 240.12b-20, as alleged *supra*. Due to the Director Defendants' materially false and misleading statements in the 2024 Proxy Statement, the Company's stockholders voted to approve the proposals in the 2024 Proxy Statement, including the re-election of the Director Defendants to the Board, thereby enabling them to continue breaching their fiduciary duties to the Company. As such, each of the Director Defendants face a substantial likelihood of liability for their role in preparing and soliciting the false and misleading 2024 Proxy Statement.

92.   Further, upon the materially false and misleading statements in the 2024 Proxy Statement, Company shareholders voted in favor of re-electing the Director Defendants. Thus, the

Director Defendants each received a material personal benefit from the materially false and misleading 2024 Proxy Statement in the form of their continued service on the Board and concomitant compensation and access to inside information. As such, demand is excused as to each of them.

93.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

94.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Gupta**

95.    Defendant Gupta is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Gupta cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

96.    As CEO, Defendant Gupta also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement.  As such, Defendant Gupta could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Gupta is therefore futile.

97.    Defendant Gupta also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Gupta is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

98.     In addition, Defendant Gupta receives lucrative compensation in connection with his employment with the Company. Defendant Gupta is not independent from Defendants Sewell, Ward, and Sridhar as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Gupta. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Gupta could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

99.     Because of Defendant Gupta's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Gupta is unable to comply with his fiduciary duties and prosecute this action. Defendant Gupta is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendants Laumas, Aggarwal and Kenkare-Mitra**

100.     Defendants Laumas, Aggarwal, Kenkare-Mitra served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein

101.     Defendants Laumas, Aggarwal and Kenkare-Mitra breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Laumas, Aggarwal and Kenkare-Mitra face a substantial likelihood of liability for their

breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons is Futile**

102. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

103. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

104. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

105. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent

objective judgment in deciding whether to bring this action.

106.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

107.    Publicly traded companies, such as Unicycive, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

108.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

109.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

110.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

111.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

112.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to disclose that: (i) Unicycive's readiness and ability to satisfy the FDA's manufacturing compliance requirements was overstated; (ii) the OLC NDA's regulatory prospects were likewise overstated; and (iii) as a result, the Company's and the Individual Defendants' public statements were materially false and misleading at all relevant times. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

113.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

114.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## <u>SECOND CAUSE OF ACTION</u>

### <u>(Against the Individual Defendants for Gross Mismanagement)</u>

115.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

116.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

117.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

118.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

121.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

122.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

125.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

126.    Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)

127.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

128.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

129.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

130.    The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

131.    The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement filed with the SEC.

132.    The 2024 Proxy Statement was used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board, among other things.

133.    The 2024 Proxy Statement was materially false and misleading because it concealed from investors that: (i) Unicycive's readiness and ability to satisfy the FDA's manufacturing compliance requirements was overstated; (ii) the OLC NDA's regulatory prospects were likewise overstated; and (iii) as a result, the Company's and the Individual Defendants' public statements were materially false and misleading at all relevant times.

134.    Further, the 2024 Proxy Statement was false and misleading when it discussed the Board's role in risk oversight because, despite representations to the contrary, the Board was not in fact fulfilling its oversight responsibilities. It was known, or should have been known, to the Director Defendants in the exercise of prudent business judgment that the Board was not exercising adequate risk oversight. As such, the foregoing statement in the 2024 Proxy Statement was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

135.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading.

136.    The materially false and misleading statements contained in the 2024 Proxy Statement misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

137.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.    Against the Individual Defendants, and in favor of the Company, for the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement, and waste of corporate assets;

B.    Against the Director Defendants, and in favor of the Company, for the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, removing officers or directors from their positions, or adding officers or directors to the Company as warranted, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and risk management, and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board, and otherwise improve the policies and procedures by which the Board manages the business affairs of the Company.

D.    Awarding to the Company restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

1        F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 30, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: /s/ *Alex J. Tramontano*
    ALEX J. TRAMONTANO

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com
Email: byrd@whafh.com
Email: tramontano@whafh.com

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

- 31 -

1
2

## VERIFICATION

3
4
5
6
7
8
9
10

I, TACARRA JACKSON, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Unicycive Therapeutics, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Unicycive Therapeutics, Inc. common stock at all relevant times.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_____

TACARRA JACKSON